Mr. Stanton. May it please the court Mr. Mariotti. Good morning my name is Bill Stanton and I represent Brian Lawrence. After a jury trial Lawrence was acquitted of possessing ammunition but convicted of possessing with intent to distribute roughly half a kilo of cocaine. He was sentenced to 262 years in prison. On appeal Lawrence claimed several errors, namely that the evidence presented at trial did not amount to proof beyond a reasonable doubt, that a rule 16 violation warranted a mistrial, that evidence of a dog sniff was improperly admitted, that a supplemental jury instruction on possession was improper, and that the 22 year sentence in this case was excessive. I'd like to start with the rule 16 violation. It's our position that by denying the defendant's motion for mistrial the district court abused its discretion. Obviously under rule 16 the government must disclose a statement of the, an oral statement of the defendant made to a law enforcement agent before or after arrests. But if we assume as we have to by our circuit precedent that jurors follow the instructions that are given to them then what was the harm of the rule 16 violation? Judge, I think once this statement of Mr. Lawrence came out that the bell was rung and it could not be unrung at that point, this curative instruction that the district court gave was actually given approximately two hours after this testimony had been elicited. Mr. Stanton, I don't understand this because I guess what I don't understand is you're focusing on the so-called two stacks comment, right? Correct. No objection as I understand it to testimony that Mr. Lawrence told the agent or the officer where to get the key to open the safe. That was disclosed that he had directed him to the key. That comes in, shows pretty good evidence of possession of what's in the safe, right? Yes. So why is the two stacks comment so poisonous? Because, well, it's clear that it's further impugning the character of Mr. Lawrence whether it's considered a bribe or a reverse bribe or however you want to characterize it, that he's trying to have unsavory dealings with a law enforcement agent in terms of getting $2,000 from the safe given to his wife in exchange for Mr. Lawrence cooperating with their investigation. But I was confused by that too because, you know, the essence of this is the key and, you know, it's not a bribe for sure because Lawrence wasn't promising to give the $2,000 to Hopkins. He's saying, Hopkins, you give it to my old girl and, you know, of course, why would Hopkins do that? But he plays along as I understand it and this is all about finding the key and yet that's, you've agreed, that part's harmless because that's in anyway. The key's in that was disclosed. At what point was it disclosed that Lawrence made this statement to a law enforcement agent regarding the $2,000? I mean, I can easily see even if the court hadn't given an instruction, I imagine the government would be making a harmless error argument. The court does give the instruction and just says, you know, it's not worth blowing up the trial over this. You know, let's just make sure the jury understands that it should disregard that comment. It's neither here nor there. And I'm a little mixed up about this, I think, because I thought that the district court gave a pretty thorough and immediate warning to the jury not to use the statement. Am I wrong? Judge, I believe you are respectfully. No, no, that's okay. It doesn't have to be respectfully. The district court allowed the government to conclude its direct examination of this witness. It then took a lunch break and told the government, can you please tell me where you disclosed this to the defense? The government thought it had disclosed it in a letter or something. Over the lunch break, the government could not locate that disclosure. When we came back was when the admonishment was given to the jury. Like I said, roughly two hours after the cat was out of the bag at that point. But it's a little kitten that's out of the bag. It's not a whole cat if the key part isn't there. I mean, obviously it was a mistake, but trials aren't perfect and most mistakes are curable. They're not, Judge, but in order for the defendant to adequately prepare his defense for this trial, he needs to have all his statements that are going to be introduced into evidence against him prior to trial. This clearly was a statement that was introduced by the government that was not disclosed. I'm tempted, although this is an impossible question for you to answer really, to wonder what he would have done differently had he received proper disclosure of this statement. It seems to me his big issues are the fact that the search can take place as it does and he's upstairs, but there's this drawer sitting there with all this stuff out in it. Could they come upstairs? I guess that goes more to the first issue, the proof beyond reasonable doubt issue. This was a close case. They did acquit him of the bullets that were— Why does that make it close on the other part of the case? I mean, it could be close on the ammunition part. Well, if you're saying that you found bullets underneath the bed where he sleeps and those were his bullets, but you find cocaine in the— In the drawer that exactly matches the empty drawer for the nightstand. There's no pictures of that, no documentation of that. Yeah, but there's testimony. The agent who testified to that did not author any reports to that effect. There's testimony, though, right? Correct. And it's sitting there. There are photographs of it sitting there open in the hall upstairs. Right, and it was in a hall upstairs where approximately eight other residents of that house actually slept. So a lot of people live there, and cocaine and money is just sitting there, right? At least 12. At least 12 residents of the house. And this stash of cocaine and money is just sitting there in the hallway in this drawer. A stash of cocaine and money that one of the residents, Reginald Kanfor, admitted was his. But, of course, the drawer contained correspondence with Lawrence's name on it. That's not accurate, no. It isn't? No. The nightstand in the bedroom on the first floor contained mail that had Brian Lawrence's name at a different address, I think in Dalton. Right, but this drawer— That matches the drawer. Exactly, and you know, it's pretty unusual. I mean, black with gold. I wouldn't characterize it as that unusual, Judge, but the fact that these agents had cell phone cameras that they used to take a picture of the drawer as it laid in the hall, but then when they supposedly matched the drawer into this nightstand in the first floor, there was no picture taken of that, is highly suspect. You also have fingerprints that are recovered from a scale inside this drawer, three fingerprints, none of which match my client. There's evidence that Mr. Kanfor, the individual who admitted the drugs were his, they were trying to track him down on at least a dozen occasions a special agent went to get further fingerprints from him to see if his fingerprints actually matched. But, of course, you have two issues here. We have one, which is joint possession. Just because maybe other people had some possessory interest doesn't mean Mr. Lawrence didn't, too. Joint possession. And then, secondly, constructive possession. You know, it's upstairs in the hall, not in his room. We'll agree he doesn't live in the hall, as far as I know, but still you can have constructive possession. It seems like these were both properly advanced. I think in order to show that, you have to show some intent to control. And what the government introduced. And he's right upstairs next to the drawer, you know, after an amount of time. One agent said that. Another agent said he was at the base of the stairs. So? And his wife testified. If you're challenging sufficiency, the government gets the benefit of all those conflicts, right? Sure. In a light, most favorable, would a rational juror find that this was sufficient evidence? We think, based on the totality of the evidence that was presented, it was insufficient. There was testimony that he was in a bathroom. There was testimony that he was at the base of the stairs. There was testimony that he was upstairs, feet away from this drawer. Three different witnesses testifying to three different things. As it relates to the dog sniff evidence that was introduced. You know, that argument has been discredited by the circuit for some years. For at least 15 years. Based on my research. I don't know. But, I mean, what we heard at trial was that. I understand it, though. What we heard at trial was unless this paper money comes directly from the Federal Reserve, that it could be contaminated. The expert, I think it was Officer Perez, testified that he's not sure. All he knows is that if it's from the Federal Reserve, it's not contaminated. But dogs would alert on every single person, and they don't. It's apparently this methyl benzoate they alert on, which has to be relatively recent contact. Well, I think we have to take into account the fact that there's no indication with an alert when that residue was deposited. Well, I think the science is to the contrary, that it doesn't last, that the methyl benzoate dissipates, and so it can't have been very long. I think there's studies that also show 90% to 96% of currency is contaminated. But that's the thing. If we bring a dog through, I mean, they test the dogs, and they walk through the room. They don't alert on every single person. If they did, you would disqualify that dog as useless. I mean, I've seen the dogs wandering around the customs area when you come back into O'Hare, and they sniff away at people and things, and they don't alert most of the time. They're looking for Chanel purses. Just to briefly answer that question, I see I'm in my rebuttal time. We think the fact of contamination is virtually meaningless. While this dog was trained to detect it, what does that detection indicate in today's society where so much currency is contaminated? I hate to tell you, I'm right there with you. Ever since I had a case a number of years ago with Hondo, the dog sniffing. Dog, and his accuracy rate only turned out to be 51%. But we do have this case, $30,670, in which we discussed at some length this theory. So it's at least a hurdle, I think, for you. But if you want to save some rebuttal time, that would be fine. Thank you. Thank you. Mr. Mariotti. May it please the Court. The District Court did not— Before you start, something's been bothering me, and it's something that you— and you might not know the answer to it, but it was something that you mentioned in your brief. You said that Officer Perez calculated Achilles' alert success rate on tainted money at 90%. And I wanted to know, is that based on some standardized testing by some disinterested tester, or is it just Officer Perez's calculations based on trials he's performed with Achilles? Judge, this isn't in the record, but my personal knowledge of this is that he conducted tests over a period of time in which the dog was placed in rooms with currency that they knew to be contaminated, and he calculated that rate over that period of time. And that is how he calculated his accuracy rate. You know, let me address now the denial of the mistrial. The District Court did not abuse its discretion by denying the defendant's motion for mistrial. I understand there was some comment that there was a couple hours that took place. Obviously, this testimony was elicited shortly before lunch. That's understandable, but the corrective action taken by the District Court was while the witness was still on direct examination. But it is a bizarre bit of testimony. I can't think of cases in which I've seen a police officer recounting that a person was saying, here's my price for telling you a piece of information, like where the key's located. Give my girlfriend two out of the $10,000 in the bag or whatever, or the safe. It's very fishy, and it seems like a trier of fact might wonder about all parties concerned. It certainly, Judge, it might go to the bias, for example, as to Phyllis Williams, who later testified. But I don't think it was prejudicial regarding the defendant, for the reasons that Judge Hamilton discussed earlier. Now, did Officer Hopkins play along with this? Did he say, sure, I'll give her the money? He did. If anything, I think it potentially called into question Agent Hopkins and his truthfulness. And that was also at play with that statement. As Judge Hamilton, I think, pointed out earlier, the defense did not object to the admission of the testimony regarding him giving the key. Was the two stacks commented in a written report anywhere? It was not. How did this happen? I mean, this is the kind of thing, this is just sort of basic fairness in criminal proceedings, right? It's a fundamental obligation the government has. That's fair, Judge. So what happened? Well, first of all, the parole agents are not law enforcement agents in the ordinary course. I mean, their job is usually to supervise parolees. So the reports in this case had to be supplemented through pre-trial interviews with ATF agents, and those agents' reports were produced to the defense. There were numerous statements of the defendant that were made that were disclosed to the defense in terms of pre-trial matters. That's good. That was. And this disclosure, you know, I would maintain, you know, we're not contesting that for purposes of this appeal, but it was disclosed to the defense as part of that. The two stack statement was not disclosed, was it? Well, it was. I mean, I would submit to Your Honor that it was disclosed, but it wasn't adequately memorialized in the letter that contained a number of different statements. So we don't have anything in the record indicating that it was disclosed? Correct. And just to be crystal clear, I'm not suggesting that the defense counsel in this case, who is a very honorable man, was suggesting something that wasn't true. It's just that there were multiple trial dates in this case, and we've had many discussions regarding those statements.  And I believe it was disclosed, Judge. But since it wasn't adequately memorialized, I went back after lunch. I was convinced before lunch that it was disclosed. I went up and I looked at the letter. It wasn't adequately memorialized. I fell on the sword, so to speak, and the court immediately gave a curative instruction, told the jury to completely disregard that statement, and did the same at the end of the trial. And I think that on that record, there is no prejudice against the defendant. And frankly, even if it came in, I think the error would have been harmless. And it's presumed harmless when it's the subject of a curative instruction. And as there was some suggestion earlier that it was a bribe or a reverse bribe, I don't think that adequately describes the testimony for the reasons discussed by Your Honors earlier. I also think that there was sufficient evidence as to the count of conviction. I mean, the agents recovered a drawer full of cocaine just feet from the defendant. That drawer matched the nightstand in the defendant's room that was missing a drawer. And the defendant was standing at the top of the stairs in his underwear. And there was proof that he knew that the agents could only search areas under his control, the bedroom. So he had an incentive to move that drawer from his bedroom to the top of the stairs. All of that established that the defendant had control of that drawer and had possession of that drawer. Am I right that there were two or three minutes that elapsed between knocking on the door and the girlfriend answering? There was actually a testimony of several minutes. It took quite some time for that to happen. And there was no contention over whether that was his bedroom. He not only told the agents that, but the defense elicited testimony from his fiancée. The remaining issue is the drug-sniffing dog that was raised. And the district court did not abuse its discretion in admitting that evidence either. There has been multiple precedents of this court, United States v. Hubbard, United States v. Funds in the amount of $30,670, in which it's made clear, this court made clear that that evidence is admissible and that it's up to the jury to decide what way to give to that evidence. It was properly admitted by the district court, and the jury could have given that whatever way they felt it's deserved. For all those reasons, unless there are further questions, we would ask the court to affirm the conviction and sentence in this case. All right, thank you very much. Anything further, Mr. Stanton? Very briefly. Counsel touched upon and he was asked whether there were several minutes that elapsed between the agents ringing the doorbell and the door being answered. One of the two parole agents that testified, Agent Hopkins, said it was several minutes. Agent Hollenbeck said it was not an unusual amount of time. So there was a discrepancy there. As far as the fundamental fairness of the proceedings by this Rule 16 violation, we do believe it was a material nondisclosure that does need to be corrected at this point. The only other point that we haven't touched upon yet is the sentence, and Mr. Lawrence was far from an angel in terms of his criminal background. We accept that, but essentially he got a 22-year sentence for possessing half a kilo of coke when without that career offender application he would have been looking at an 8 or 9-year sentence. So that almost tripled his sentence based on that application that was discretionary, not mandatory. We think that the district court did abuse his discretion by applying the career offender designation. There's no questions on any of that? There are none. Thank you. Thank you very much. Thank you. And you took this case by appointment, did you not? Yes. We appreciate your efforts for your client and for the court. Thank you. Thanks as well to the government. Before moving on to our fifth case, the court is going to take a brief recess, so we'll be back in about five minutes. Thank you.